UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BETTY NELSON,                                              Case No. 14-10502

                Plaintiff,                                 Paul D. Borman
                                         United States District Judge

v.

GREEN OAK TOWNSHIP;
OFFICERS J. GRAVIS and P.H. MOLL,
in their individual and official capacities,

                Defendants.
_____/

OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 24)

      This action arises out of Plaintiff's arrest at her home on the evening of February 4, 2012 when, unbeknownst to Plaintiff, paramedics and officers were called to the home by Plaintiff's suicidal roommate. Plaintiff claims that officers falsely arrested her, and used excessive force against her, in the course of their efforts to remove her suicidal roommate from the home. Defendants respond that Plaintiff obstructed responders' efforts to remove a suicidal individual from the home, assaulted an officer and resisted the officer's commands to surrender her hands for handcuffing. Defendants submit that the officers used only the force that was reasonable under the circumstances to subdue and arrest the Plaintiff and now move for summary judgment. The Court has reviewed the parties' briefing (ECF Nos. 24, 27, 28) and held a hearing on August 19, 2015. For the reasons that follow, the Court GRANTS IN PART AND DENIES IN PART Defendants' Motion for Summary Judgment.

## I.      FACTUAL BACKGROUND

### A.      Plaintiff's Version of Events

Plaintiff claims that on the morning of February 4, 2012, Elaine Campbell, an acquaintance of Plaintiff's who was temporarily living at Plaintiff's home, asked Plaintiff if Campbell's brother-in-law, James Campbell, could come to Plaintiff's home to repair Ms. Campbell's car, which was parked in Plaintiff's driveway and could not be driven.  ECF No. 24, Defs.' Mot. Ex. 3, Sept. 23, 2014 Deposition of Betty Nelson 162-63, 167.  Plaintiff agreed to let Mr. Campbell help Ms. Campbell with her car but, because Plaintiff had a personal protection order against James Campbell, Plaintiff decided it would be best if she left the home.  *Id.*  Plaintiff testified that "she stayed away all day because of the personal protection order." *Id.* at 157.  Plaintiff returned home sometime in the late afternoon, watched some television, talked to her friend Mike Fish (now deceased) who was staying with Plaintiff at the time and, around 4:00 p.m., Plaintiff consumed two beers. *Id.* at 160-62.  At approximately 8:00 p.m., Plaintiff took went to take a nap because she was not feeling well.  *Id.* at 160.

At approximately 10:00 p.m., Plaintiff became aware that Ms. Campbell was sitting on the front porch of Plaintiff's home.  *Id.* at 167.  Plaintiff went out on the porch, encountered Ms. Campbell speaking with several officers and asked Ms. Campbell if she was "Okay."  *Id.* at 169.  Plaintiff states that she was asked "politely" by one of the officers on the porch to go back inside the house.  *Id.* at 169-70.  Plaintiff complied and went back inside the house and sat with Mr. Fish. *Id.* at 170-71.  Mr. Fish then informed Plaintiff that while Plaintiff was napping, Ms. Campbell had apparently begun feeling suicidal and she called the police to come to the house to assist her.  *Id.* at 171-72.

2

As Plaintiff was standing inside the front door, one of the Green Oak Township police officers and the Livingston County Fire Department Chief, Kevin Gentry, entered the home as Plaintiff was backing up near the front of her bathroom. *Id*. at 174. Plaintiff was informed that Ms. Campbell was going to be taken to St. Joe's hospital but was not given any medical information about Ms. Campbell's condition. *Id*. Plaintiff asked if she could go upstairs to get some clothes for Ms. Campbell for the transport because it was cold outside. *Id*. at 174-75. While this transpired, the officers "were nice" to Plaintiff. *Id*. at 175. Plaintiff did go upstairs and retrieved "a couple of sweaters" for Ms. Campbell. *Id*. Plaintiff asked the officers if she could go into her kitchen to get a bag for the sweaters, which she proceeded to do. *Id*. at 175-76.

Plaintiff then walked back toward the crowd of people in her front hall near her bathroom with the bag of clothes in her hand. *Id*. at 176-77. Plaintiff was standing inside the bathroom because the hallway was so crowded and she asked Ms. Campbell to "come here." *Id*. at 180. She gave Ms. Campbell a hug, told her she was doing the right thing and that everything was going to be all right. *Id*. Plaintiff was telling Ms. Campbell to be sure to demand treatment for her alcoholism and depression and warning Ms. Campbell not to "let the system take over," and not to just "trust" that she was going to get the treatment she needed. *Id*. at 181-82. Ms. Campbell returned her hug but was verbally non-responsive to Plaintiff's comments and Plaintiff kissed Ms. Campbell on the top of her head. *Id*. at 182.

At this point, Officer Gravis said that they were trying to get Ms. Campbell to go and Plaintiff explained that Ms. Campbell would not take the bag of clothes that Plaintiff was holding. *Id*. at 182-83. Officer Gravis then told Plaintiff that up until that point they had "been nice" but that they would not be nice "any longer." *Id*. at 183. Plaintiff felt threatened and confused by Officer

Gravis's comment and tried to hand him the bag, which she swung toward him, accidentally hitting him on his leg. *Id*. at 183. Plaintiff stated that she "did not hit [Gravis]," but that the bag may have dropped when she tried to hand it to him. *Id*. at 185-86.

Gravis then told Plaintiff she was under arrest for assaulting an officer and asked her to turn around. *Id*. at 186. Plaintiff was "scared to death" and started crying, asking Gravis why she was being arrested. *Id*. at 187. He told her she had assaulted an officer, forced her inside the bathroom facing the sink and grabbed her hand and started to pull and she raised her voice and said, "Please, not my shoulders." *Id*. at 188. Plaintiff had been going through therapy for nerve issues from her neck and into her shoulders, she did not have full range of motion in her arms and shoulders and she was not able to do what Gravis was forcing her to do. *Id*. at 188-89. She kept crying and saying "not my shoulders," and "it won't do it," but Gravis kept forcing. *Id*. at 190. Gravis then pushed Plaintiff forward, gave her arm a twist and pulled it upwards behind her back so that her thumb was near her shoulder blade, grabbed her hair and the back of her head, pulled her hair backwards and refused her pleas that he stop. *Id*. Gravis only responded that "now Plaintiff was facing additional charges for resisting arrest. *Id*. at 190-91." In the process, Officer Moll entered the room and they both pushed Plaintiff was up against her sharp edged bathroom sink corner which hit her directly on the incision from a three-month old hip replacement surgery, the pain of which caused her to collapse, screaming "it hurts, it hurts, please don't, my shoulders." *Id*. at 191-92. Mr. Fish was screaming from the living room "You can't do that to her shoulders," and was being held back by another officer. *Id*. The officers handcuffed Plaintiff and pulled her up off the bathroom floor by her wrists, which were behind her back and pulled up near her shoulder blades, and pulled by her hair. *Id*. at 192-94.

4

Plaintiff was then pushed out the front door of her house, down the steps across her front yard and through a drainage ditch. *Id.* at 194. She was losing all strength and Gravis kept yelling at her to stop "being dead weight." *Id.* But she was having a difficult time walking up the grade of her front yard to the patrol car. *Id.* When they arrived at the patrol car, Gravis released her arms and shoved her in the back of the car in a laying down position. *Id.* at 195. Once pushed into the patrol car, Plaintiff had to reposition herself because she was lying on her shoulder and she was screaming because the pain "was excruciating." *Id.* at 195-96.

Plaintiff is not certain how long she was seated in the patrol car alone but when Gravis returned, she did not tell him about the pain she had been experiencing while she was waiting but did say she was in pain asked him to take the handcuffs off from the back position and put them in front. *Id.* at 198. Gravis did not move the handcuffs and began driving away. *Id.* Plaintiff was telling him that it hurt and she was being jostled around the backseat due to the potholes on her road, pleading with Gravis to move the handcuffs to the front. *Id.* at 199-200. After driving the length of two blocks, Gravis did pull off to the side of the road and moved Plaintiff's handcuffs to the front of her body and placed her seat belt on her. *Id.* at 200-02. Plaintiff told Gravis that she needed to go to the hospital but he told her they were going to the Livingston County Jail. *Id.* at 202-03. Gravis drove Plaintiff to the Green Oak Township Police Department where she was transferred directly to another vehicle and driven to the Livingston County Jail. ECF No. 27, Pl.'s Resp. Ex. D, Jan. 30, 2015 Deposition of Alicia Ring Montes 12.

Plaintiff was seen on February 7, 2012, three days following the incident, at St. John Providence Hospital and by Dr. Robert Adams. Pl.'s Resp. Ex. M, Medical Records. She presented at St. John with contusions to her upper extremities, a neck sprain and anxiety. *Id.* at PgID 562. Dr.

5

Adams assessed Plaintiff and observed a head contusion, bilateral shoulder and wrist contusions, bilateral hip and shin contusions.  *Id*. at PgID 567.

**B.        Defendants' and Emergency Personnel's and Ms. Campbell's Version of Events**

There is no significant variation in the testimony of the Defendants, the EMS and Fire personnel and Ms. Campbell as to the events that transpired at Plaintiff's home on the evening of February 4, 2012, but their collective recollection of events differs from Plaintiff's.

At approximately 9:00 p.m. on the evening of February 4, 2012, Green Oak Township Officers Gravis and Moll, arriving in separate vehicles, responded as an assist to the Livingston County EMS and Fire to a possibly suicidal individual at Plaintiff's home.  Defs.' Mot. Ex. 1, Dec. 1, 2014 Deposition of Jeremy Gravis 17-18; Defs.' Mot. Ex. 2, Dec. 1, 2014 Deposition of Gregory Moll 17; Pl.'s Resp. Ex. E, Feb. 3, 2015 Deposition of Kevin Gentry 10-11; Pl.'s Resp. Ex. G, Green Oak Township Fire Department Report of Chief Gentry 1; Pl.'s Resp. Ex. H, Reporting Officer Narrative by Officer J. Gravis 1.  Police respond on such a call to secure the scene to make sure it is safe for EMS.  Gravis Dep. 17-18; Moll Dep. 18; Gentry Dep. 10.  Officer Gravis was first to arrive on the scene and encountered a female who identified herself as Elaine Campbell seated on the front porch of Plaintiff's residence. Gravis Dep. 18; Gravis Report 4.  Ms. Campbell stated to officers that she had placed the call to EMS and that she was suicidal and wanted to go to Chelsea Hospital.  Gentry Dep. 12; Moll Dep. 24; Gravis Report 4.  Moll was familiar with Plaintiff because he had been called to the neighborhood on past occasions to mediate disputes between Plaintiff and Ms. Campbell's brother  in law, James Campbell.  Moll Dep. 13-17.

Ms. Campbell testified that her suicidal thoughts that day were brought on by Plaintiff, who was whispering back and forth with Mr. Fish in the kitchen of Plaintiff's home, words that sounded

to Ms. Campbell "like they were going to do some kind of bodily harm" to Ms. Campbell. Defs.' Mot. Ex. 5, Jan. 12, 2015 Deposition of Elaine Campbell 29-30. Ms. Campbell became fixated on her own safety, called 911 and did not think to mention to responders when they arrived about the comments that Plaintiff and Mr. Fish had made that provoked her anxiety/suicidal thoughts. *Id.* at 30-31. To this day, Ms. Campbell testified, the Plaintiff "totally terrifies" her. *Id.* at 67. While Plaintiff conceded that she had consumed two beers that day, Ms. Campbell recalls that Plaintiff got very belligerent when she was drunk and that the day of these events Plaintiff had consumed "six or seven beers." *Id.* 18, 24. Officers also believed that Plaintiff was intoxicated, based upon her irrational yelling and screaming and belligerent behavior. Moll Dep. 25.

After Gravis and Moll determined that the scene was secure, EMS and Fire arrived; Chief Fire Officer Kevin Gentry and Samantha Lee, both of whom were off duty but happened to be together and answered the call to respond to the scene. Gentry Dep. 10-11; Gentry Report 1. Gentry and Lee encountered Gravis and Moll on the front porch of Plaintiff's home speaking with Ms. Campbell. Gentry Dep. 12-13; Gentry Rep. 1; Pl.'s Resp. Ex. F, Feb. 3, 2015 Deposition of Samantha Lee 10-12. Moll was attempting to engage Campbell and get her story but was having trouble getting information because Plaintiff kept coming out on the porch, a minimum of three times, screaming and interrupting the patient interview. Moll Dep. 23; Gravis Dep. 21-23. Moll eventually asked Gravis to escort Plaintiff back inside the house and calm her down. Moll Dep. 23-24. Plaintiff complied with Moll's request and Gravis followed her in the house. Moll Dep. 24; Gravis Dep. 19-20. Fire Chief Gentry then suggested to Ms. Campbell, who was sitting on the porch without shoes, that she go inside and get some shoes and clothes so they could take her to the hospital. Moll Dep. 26. Gentry and Lee then proceeded inside the house with Ms. Campbell. Moll

7

Dep. 26.  Moll stayed outside.  Moll Dep. 27.

　　　Inside the house, Plaintiff told Gravis that Elaine had been going through a break up and that she had been drinking.  Gravis Dep. 24; Gravis Report 4.  Gravis observed that Plaintiff also had been drinking, based on the odor of intoxicants on her breath, her slurred speech and glassy, watery eyes.  Gravis Dep. 24-25; Gravis Report 4.  Gravis believed Plaintiff and Elaine had been drinking vodka.  Gravis Dep. 25.  Gentry and Lee were inside the house with Ms. Campbell helping her to get some clothes and shoes so she could go to the hospital.  Gravis Dep. 26; Gentry Dep. 12.  Plaintiff left the group for a bit and returned with a bag with Ms. Campbell's belongings that Gravis estimated to be the size of a beach ball, not a plastic shopping bag.  Gravis Dep. 27-28; Gravis Report 4.  Gravis assumed the bag contained clothing but never actually examined the contents of the bag which did accompany Ms. Campbell to the hospital. Gravis Dep. 28-29.  Gentry believed that the bag contained clothes and a bible, the items that Ms. Campbell had asked to be gathered for her to take to the hospital.  Gentry Dep. 15-16.  Gentry estimated the bag to be a cloth bag, not a plastic garbage bag, smaller than a laundry bag with a drawstring top.  Gentry Dep. 16.  Lee also thought the bag looked like a cinch sack of some type, maybe 10 inches high by three inches wide, but not a garbage bag.  Lee Dep. 15-16.  Gentry observed that Plaintiff appeared "intoxicated and a bit agitated," and was "loud and using exaggerated movements."  Gentry Dep. 13.   Lee also thought Plaintiff appeared intoxicated.  Lee Dep. 13-14.

　　　At some point, Gentry said the ambulance was there and they were ready to go.  Gravis Dep. 30; Gentry Dep. 12-13.  Initially Plaintiff was supportive and, still holding onto the bag of Ms. Campbell's belongings, gave Ms. Campbell a hug in the foyer/hallway area of the house.  Gravis Dep. 30-31; Gentry Dep. 14, 16; Gentry Report 1.  Quite suddenly however, Plaintiff's demeanor

8

changed and she placed herself between Ms. Campbell and the officers/EMS personnel and stated, looking directly at Gentry, "I don't trust you," and "I don't want her to go with you guys."   Gravis Dep. 31-32; Gentry Dep. 14; Gentry Report 1; Gravis Report 4.  It was apparent that Plaintiff did not want Ms. Campbell to go with the EMS personnel and her tone was hostile.  Gravis Dep. 32; Gentry Dep. 15, 26.  Gentry suggested to Ms. Campbell that she come along with him and Gravis told Plaintiff to "pipe down."  Gentry Dep. 15.  Gravis told Plaintiff that Ms. Campbell wanted to go to the hospital and to get out of the way and let Ms. Campbell go with EMS.  Gravis Dep. 33.  Gravis told Plaintiff  something along the lines of "Ma'am I've been nice, but nice is going to stop if you don't quiet down and listen."  Gentry Dep. 15; Gravis Dep. 64; Gentry Report 2; Gravis Report 4.      At this point, Gravis reached in front of Plaintiff and put his arm around Ms. Campbell to help move her past Plaintiff and toward the door and Plaintiff raised her free hand and shoved Gravis's arm, pushing both Gravis and Ms. Campbell in the direction of the stairs.  Gravis Dep. 34-35; Gentry Dep. 15-16; Lee Dep. 17-18; Gravis Report 4.  Gravis said "No" and stepped forward and Plaintiff, who had become "angrier" according to Lee, then struck Gravis with the bag of Ms. Campbell's belongings that she had in her hand.  Gravis Dep. 36-37; Gentry Dep. 18; Lee Dep. 19-20; Gentry Report 2; Gravis Report 4.  Gentry and Lee observed the bag strike Gravis somewhere in the area of his upper body.  Gentry Dep. 18, 25, 27; Lee Dep. 20; Gentry Report 2.  Gravis testified that the bag had something very hard in it and that it struck him directly in the head.  Gravis Dep. 36-37.  Gravis did not lose consciousness or fall down and had no visible injuries from being struck with the bag.  Gravis Dep. 37.

After Plaintiff struck Gravis with the bag of Ms. Campbell's belongings, Gentry took Ms. Campbell and Gravis turned to address Ms. Nelson and told her that she was under arrest for

assaulting an officer and to put her hands behind her back, which she did not do.  Gravis Dep. 38, 40; Gentry Dep. 18.  Gentry described Gravis's actions at this point as "a series of restraint moves attempting to get control of her," and pushing her into a bathroom off the hallway.  Gentry Dep. 18. Plaintiff was resisting Gravis's efforts to subdue and handcuff her, moving her arms and trying to break free from Gravis's grip and screaming.  Gentry Dep. 19; Lee Dep. 21-22.  Plaintiff pulled her hands in front of her torso and refused multiple commands from Gravis to give him her hands for handcuffing behind her back.  Gravis Dep. 41-43.  Gentry and/or Lee stepped out on the porch and summoned Moll to come assist Gravis.  Gentry Dep. 18-19; Lee Dep. 21.  Gravis was not able to employ a straight arm takedown due to the small size of the bathroom so he spun Plaintiff around and put her up against the sink, Plaintiff facing the sink/mirror, so she would stop pulling away from him so that he could get her cuffed.  Gravis Dep. 42-44; Gravis Report 4.  Plaintiff was using her entire body weight to resist Gravis so in order to get control of her he had to pin her up against the sink.  Gravis Dep. 45.  Gravis was able to place Plaintiff in handcuffs and denies that he ever raised her hands up above her waist level at anytime in the process of handcuffing her or struggling with her to get her handcuffed.  Gravis Dep. 45-46.  Gravis recalled that Moll was present at the tail end of the handcuffing when Gravis double locked the handcuffs but does not believe that Moll assisted in the initial handcuffing.  Gravis Dep. 46-47.  Moll testified at his deposition that Plaintiff was already handcuffed when he arrived at the bathroom and that he did not assist in handcuffing Plaintiff.  Moll Dep. 28-29, 34.[1]  Moll observed that Gravis was pushed up against Plaintiff at the

---

[1] Plaintiff also suggests that Officer Moll was involved in the process of handcuffing her and relies in part on Officer Gravis's Incident Report, which indicates that Gravis placed Plaintiff against the restroom wall, where he "was assisted by Officer Moll in handcuffing" Plaintiff.  Defs.' Mot. Ex. 4, Incident Report 5.  Gravis concluded, after reading his own report, that he could not recall exactly at what point Moll arrived on the scene, only that it was "towards the end" of the handcuffing

sink keeping her from pushing away from him.  Moll Dep. 43.  Moll testified that he had no physical contact with Plaintiff while she was in the bathroom and had no explanation for why Gravis's Report indicated that Moll "assisted" in the handcuffing.  Moll Dep. 33-34; Gravis Report 5.  Moll testified that by the time he arrived at the bathroom, Gravis had Plaintiff subdued and there was no reason, nor enough room, for Moll to have also entered the room and become involved.  Moll Dep. 46. Gentry stated in his report that "Officer Moll assisted Officer Gravis in detaining the female." Gentry Report 2.

Gentry did not see what transpired in the bathroom because Moll "came in" and was blocking the doorway to the bathroom.  Gentry did hear Plaintiff say: "You're hurting me."  Gentry Dep. 20.  He also heard Gravis say "relax."  Gentry Dep. 21.  Gentry thought that the events in the bathroom happened in about 20 seconds.  Gentry Dep. 21.  After placing Plaintiff in handcuffs, Gravis and Moll escorted her out of the house.  Gravis Dep. 48.  At no point does either Gravis or Moll recall Plaintiff saying that they were hurting her or that she was in pain while she was being handcuffed in the bathroom and both deny that Plaintiff's arms were pulled up behind her shoulder blades or that she was ever pulled up by her hair.  Gravis Dep. 49-50; Moll Dep. 29-30, 32-33, 35. Both officers conceded that it would have been an unreasonable use of force to bring Plaintiff's hands up to shoulder height behind her back after she was placed in handcuffs.  Gravis Dep. 46; Moll Dep. 35.

---

process.  47-48.  Plaintiff consistently refers to "they" when describing the force that was used to bring her hands behind her back, testifying that "they" were pulling her arms behind her back and that "they" pulled her up off of the bathroom floor by her shoulder blades and her hair.  *Id*. at 191, 193.  Plaintiff then testified that it was just Gravis who continued yelling at her and pulling on her as they walked out of the house and toward the patrol car.  *Id*. at 194.

Gravis and Moll then escorted Plaintiff to the patrol car, one officer on each side of Plaintiff. Gravis Dep. 48-49; Moll Dep. 34. Moll had his left hand on Plaintiff's elbow as she was walking and recalled that she was "walking fine" and not complaining during the escort to the car. Moll Dep. 31, 34. Moll testified that he did not have his hands on Plaintiff's handcuffs while escorting her to the patrol car but did not know if anyone else had hands on her handcuffs. *Id*. Gravis recalled that Plaintiff was not kicking or trying to assault the officers as they walked to the car, but could not remember whether Plaintiff "went dead weight" while they were walking her to the car. Gravis Dep. 50. Gravis's Report, however, indicates that Plaintiff did act like "dead weight" and was "uncooperative" when being escorted to the patrol car. Gravis Report 5. Moll recalled that she didn't stumble or drop like dead weight but he does recall that she told officers that she was going to sic her dog on them. Moll Dep. 36-37. Moll recalled that he may have told Plaintiff he would shoot her dog if he attacked them. Moll Dep. 47. Moll stated that he never touched her hair or pulled her head backwards, that he never saw Gravis do that and that Moll's hand never left her elbow as they walked to the patrol car. Moll Dep. 37-38. According to Gravis, Plaintiff never complained of pain while walking to the patrol car. Gravis Dep. 50-51.

Gravis placed Plaintiff in the rear of the patrol car on the passenger side in a seated position with her hands cuffed behind her back. Gravis Dep. 50. Gravis went back to speak with the EMS personnel and asked Gentry to fill out a report as a witness to Plaintiff's crimes of assaulting him and resisting arrest, before returning to the patrol car to transport Plaintiff to the jail. Gravis Dep. 52-54. Gravis testified that Plaintiff "hindered fire and EMS personnel," assaulted him and resisted his efforts to place her in handcuffs. *Id*. at 53. At some point Gravis activated the in-car video

system.  Gravis Dep. 51.[2]  Officer Moll left in a separate vehicle but was following close behind Gravis and the Plaintiff.  Gravis Dep. 55-56.

At some point, when Plaintiff began yelling and screaming that her handcuffs were bothering her, Gravis pulled his car off to the side at a spot where the dirt road widened, exited the vehicle and placed Plaintiff's hands in front of her body and recuffed her.  Gravis Dep. 56-57.  When Gentry encountered the stopped patrol car, he stopped and exited his vehicle to see if Gravis needed assistance.  Gentry heard Plaintiff complaining that her handcuffs were hurting her and saw Gravis attending to Plaintiff.  After the short stop, both vehicles continued on their way.  Gentry Dep. 22.  The road was a dirt/gravel road with some bumps so the vehicles were traveling slowly, about 10 MPH.  Gravis Dep. 15; Moll Dep. 39-40.  Moll also observed Gravis stop his vehicle and get out of his vehicle where the narrow road widened into a "V."  Moll Dep. 39-40; Gravis Dep. 56-57; Gravis Report 5.  Moll got out to assist and heard Plaintiff saying her handcuffs were hurting her arms.  Moll observed Gravis take the handcuffs off and place them back on Plaintiff's hands in front of her body.  Moll Dep. 40-41.

According to Gravis, Plaintiff did ask at some point along the route to be taken to a hospital.  When Gravis asked her why, she indicated that she was "CMH," community mental health, but did not complain of a physical need to go to the hospital.  Gravis Dep. 62-63; Gravis Report 5.  Because he did not consider her mental health issue to be an emergency condition, he did not divert to the hospital and continued to the police station.  Gravis Dep. 63.

Gravis proceeded to the Green Oak Township police department without further incident and passed Plaintiff off to Officer Ring, who was waiting in a patrol car to transport Plaintiff to the

---

[2]  The video evidence has not been made of the part of the record by either party.

13

Livingston County Jail.  Gravis Dep. 59-60; Moll Dep. 41; Ring Dep. 12.  When en route, Plaintiff asked Ring where they were going and Ring responded to the jail.  Plaintiff became "extremely upset" and said she was CMH and wanted to go to the hospital.  Ring Dep. 12-13.  When they arrived at the jail, Plaintiff did not report any injuries but did continue to mention that she was CMH.  Ring Dep. 16.  Plaintiff was met by a jail nurse, gave a medical history and was accepted into the jail.  Ring Dep. 21.  Plaintiff spent two nights in the jail and was released the following Monday, around 3:30 or 4:00 p.m.  Pl.'s Dep. 55-56.

### C.  Plaintiff's Preliminary Exam and Plea of No Contest

Gravis did swear out a criminal complaint against Plaintiff for resisting and obstructing under Mich. Comp. Laws § 750.81(d)(1).  ECF No. 29, Defs.' Amended Ex. 7, Transcript of Preliminary Examination Hearing (Hereinafter "Prelim. Exam Tr.").  Plaintiff's Preliminary Examination on the resisting and obstructing charges was held on March 5, 2012, before the Honorable Carol Sue Reader, District Judge of the 53rd District Court for the County of Livingston, in Howell, Michigan.  Prelim. Exam Tr. at PgID623-649.  Officer Gravis testified at the preliminary examination and identified Plaintiff, who was present in the courtroom.  Gravis gave testimony consistent with his Report and his deposition regarding the events of the evening of February 4, 2012 at Plaintiff's home.  Gravis did testify, consistent with his report but inconsistent with his deposition, that Officer Moll "came into the restroom and ended up helping [Gravis] handcuff Ms. Nelson."  Tr. 17, PgID639.  Plaintiff's criminal attorney, Ms. Lynn D'Orio, cross-examined Officer Gravis.  On cross-exam, Gravis again stated that "Pat Moll came while I was trying to get [Plaintiff] handcuffed."  *Id.* at 24.

14

Judge Reader found that there was probable cause to believe the Ms. Nelson assaulted, battered, resisted, obstructed and opposed Gravis and that at that time, Ms. Nelson had reason to know that Gravis was performing his duties as a police officer, and resisted handcuffing by pulling her arms away from the officer in the bathroom area and continuing to resist all the way to the car and continuing "to scream and carry on." *Id*. at 25-26. Judge Reader continued Plaintiff's bond and bound the matter over for trial. *Id*. at 26.

Plaintiff was charged with: Count I - Resisting and Obstructing a police officer, Mich. Comp. Laws § 750.81d(1); and Count II - Attempted Resisting and Obstructing, Mich. Comp. Laws § 750.81d(1)(a). ECF No. 29, Defs.' Amended Ex. 7, Circuit Court No Contest Plea from Judge Hatty, PgID617. Ultimately, on July 13, 2012, Plaintiff pleaded *no contest* to attempted resisting and obstructing, Mich. Comp. Laws § 750.81d(1): "The plea agreement is as follows: Dismiss Count I plead no contest to added Count II." *Id*. ¶ 11, PgID 619. In instances in which the word "guilty" appears on the Plea Form, the word "guilty" has been crossed out and the words "no contest" written in its place. *Id*.

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may file a motion for summary judgment "at any time until 30 days after the close of all discovery," unless a different time is set by local rule or court order. Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings,

15

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'

which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at

323. *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact

"would have [the] effect of establishing or refuting one of the essential elements of a cause of action

or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)

(quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material

fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely,

where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material

fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this

evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the

non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). "'The

central issue is whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v.

Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558

(6th Cir. 2005)).

If this burden is met by the moving party, the non-moving party's failure to make a showing

that is "sufficient to establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial," will mandate the entry of summary judgment.

*Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 324. "The test is

whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). In doing so, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). All facts and factual inferences are drawn in favor of the nonmovant. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). To be disregarded, a plaintiff's version of the facts must be "so utterly discredited by the record that no reasonable jury could have believed him." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial. . . . In fact, '[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.' Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting

*Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."  *Celotex*, 477 U.S. at 323-34.

## III.   ANALYSIS

### A.   Plaintiff's Claims of Excessive Force Under 42 U.S.C. § 1983 Against the Individual Defendants

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).  "There is a long-standing principle that government officials are immune from civil liability under 42 U.S.C. § 1983 when performing discretionary duties so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).  "In determining whether the government officials in this case are entitled to qualified immunity, we ask two questions: First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff [] shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?"  *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 538-39 (6th Cir. 2008) (alteration added).   "The court may address these prongs in any order, and if the plaintiff cannot make both showings, the officer is entitled to qualified immunity." *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)).  "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking

18

summary judgment." *Tolan*, 134 S. Ct. at 1866.      Plaintiff claims that officers Gravis and Moll applied unnecessary and excessive force in violation of her Fourth Amendment rights when they (1) handcuffed Plaintiff in her home and (2) forcefully escorted Plaintiff, who was handcuffed behind her back, to the patrol car.  Claims regarding an officer's use of excessive force in the context of an arrest or other seizure are governed by the Fourth Amendment:  "Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment."  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  *See also Shreve v. Franklin County, Ohio*, 743 F.3d 126, 133 (6th Cir. 2014) (reaffirming that a claim asserting the use of force in the course of an arrest "arises under the Fourth Amendment and its reasonableness standard."); *Malory v. Whiting*, 489 F. App'x 78, 82 (6th Cir. 2012) (citing *Drogosch v. Metcalf*, 557 F.3d 372, 378 (6th Cir. 2009)) ("The Fourth Amendment of the United States Constitution protects a person from being subject to excessive physical force during the course of an arrest, a booking, or other police seizure.").  The protections of the Fourth Amendment extend "'at least through the completion of the booking procedure, which is typically handled by jailers.'"  *Burgess*, 735 F.3d at 474 (quoting *Aldini v. Johnson*, 609 F.3d 858, 865-66 (6th Cir. 2010)).  "When a citizen does not fall clearly within either category . . . the Fourteenth Amendment's more generally applicable Due Process Clause governs to bar a governmental official's excessive use of force."  *Burgess*, 735 F.3d at 472.

The determination as to whether the officer has exerted excessive force during the course of seizure is determined under an "objective reasonableness" standard.  *Graham*, 490 U.S. at 396-97. "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting

19

them, without regard to their underlying intent or motivation." *Id*. at 397.  The Court analyzes the

challenged conduct from the "perspective of a reasonable officer on the scene, rather than with the

20/20 vision of hindsight." *Id.* at 396.   The Sixth Circuit recently summarized the analytical

framework applied in an excessive force case:

> Under the Fourth Amendment, we apply an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants. *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004); *see also Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865. We balance "the nature and quality of the intrusion on [a plaintiff's] Fourth Amendment interests against the countervailing governmental interests at stake." *Ciminillo v. Streicher*, 434 F.3d 461, 466–67 (6th Cir. 2006). In doing so, three factors guide our analysis: "'[(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (*quoting Graham*, 490 U.S. at 396, 109 S.Ct. 1865). These factors are assessed from the perspective of a reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly evolving circumstances without the advantage of 20/20 hindsight. *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865.

*Burgess*, 735 F.3d at 472-73 (alterations in original).

The reasonableness inquiry necessarily entails balancing individual rights with governmental

interests:

> Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.  Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or an investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. . . . Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396-97 (internal quotation marks and citations omitted).

If multiple officers are alleged to have violated a plaintiff's Fourth Amendment rights, each officer's conduct must be analyzed individually. "Each defendant's liability must be assessed individually based on his own actions." *Binay*, 601 F.3d at 650 (citing *Dorsey v. Barber*, 517 F.3d 389, 399 n. 4 (6th Cir. 2008)). "To hold an officer liable for the use of excessive force, a plaintiff must prove that the officer '(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force.'" *Binay*, 601 F.3d at 650 (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). "As a general matter, [an officer's] mere presence during [an] altercation, without a showing of some responsibility, cannot suffice to subject them to liability." *Burgess*, 735 F.3d at 475. If an officer does not directly participate in the challenged conduct, "there must be a showing that they either supervised the [officers] who did so or owed [the plaintiff] a duty of protection." *Id*. To establish that an officer not directly involved owed a duty of care, it must be shown that the officer "observed or had reason to know that excessive force would be or was being used'" and "'had both the opportunity and the means to prevent the harm from occurring.'" *Id*. (quoting *Turner*, 119 F.3d at 429.) In determining whether an officer had both the opportunity and the means to intervene, the Court must determine that the incident being challenged lasted long enough for the officers to "both perceive what was going on and intercede to stop it." *Id*. "A reviewing court analyzes the subject event in segments when assessing the reasonableness of a police officer's actions." *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (citing *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002)).

21

1.    **Viewing the facts in the light most favorable to the Plaintiff, a reasonable juror could conclude that Gravis and Moll exerted excessive force in their efforts to subdue and handcuff Plaintiff in the bathroom of her home.**

Plaintiff claims that she simply handed the bag of Ms. Campbell's clothes to Gravis, and may have inadvertently hit him on the leg with the bag, and that he grabbed her and told her she was under arrest for assaulting an officer. Plaintiff claims that when Gravis shoved her into the bathroom and shoved her up against the sink, he forcefully grabbed her hand and wrist and began to pull on her arms, at which point she warned Gravis of her shoulder problems and begged him to stop. Despite her pleas that he stop pulling her arms and hurting her shoulders, he continued to try to force her arms behind her back by twisting and bending them. Plaintiff claims that Officer Moll then entered the room and "they," presumably Gravis and Moll who were the only officers in the bathroom, raised her to her feet by pulling on her wrists and shoulders and pulling her hair. Following that, "they" raised her shoulders and arms behind her back to the level of her shoulder blades.[3]

---

[3] Each Defendant's liability must be analyzed separately. *Binay, supra*. However, as to events in the bathroom, Moll is alleged to have committed the same acts and to the same degree as Gravis. Plaintiff testifies that Moll arrived in the bathroom before she was handcuffed and that Moll "went to grab [her] right arm" and she "got pushed into" her bathroom sink," she believes by Officer Moll. Pl.'s Dep. 191, 225. Gentry also testified that Moll assisted Gravis in "detaining the female." Gentry Rep. 2. Plaintiff alleges that "they" lifted her up off of the floor by her hair and "they" pulled her arms up to shoulder height behind her back. Pl.'s Dep. 191. There is nothing in the record that would render these allegations "utterly discredited" as both Gravis and Moll could have engaged in these acts simultaneously, together lifting her and together forcing her hands behind her back. In fact, Gravis's report states that Moll assisted him with the handcuffing and Gentry testified that "Moll assisted Officer Gravis in detaining the female." Gentry Rep. 2. Thus, the record supports a reasonable inference that both Moll and Gravis engaged in the acts of excessive force alleged to have occurred in the bathroom, *i.e.* pulling Plaintiff up by her hair and raising her handcuffed arms above her shoulder blades behind her back. *See Baynes v. Cleland*, 799 F.3d 600, 608 (6th Cir. 2015) (holding that plaintiff's testimony that he told "them" (referring to two deputies collectively) that his handcuffs were too tight sufficiently implicated both officers, either one of whom reasonably could have committed the alleged acts of excessive force).

Plaintiff had not committed a serious crime, she was not attempting to flee and, viewing the facts in the light most favorable to her, she was not resisting. There is no evidence of a significant danger posed to the arresting officers, who outnumbered the Plaintiff and were standing with a number of other law enforcement officials in the hallway/bathroom of Plaintiff's home. Under the *Graham* factors, then, the situation called for minimal, if any, force to be exerted to bring Plaintiff under control. It was clearly established in 2012 that pulling a handcuffed arrestee up off of the floor by her hair and raising her handcuffed arms above the level of her shoulders behind her back (even more so when she testifies that she told officers about her shoulder injuries) would constitute excessive force. In fact, both Gravis and Moll admitted that such conduct would have amounted to excessive force under the circumstances they faced. In addition, in this case, a reasonable juror could conclude that Plaintiff had informed Gravis and Moll of her shoulder injuries (Plaintiff so testified and Gentry heard Plaintiff say to Gravis and Moll, "stop, you're hurting me"), in which case a reasonable juror could conclude that continuing to press her arms up toward her shoulders was "objectively unreasonable and amounted to gratuitous violence because of their knowledge of the preexisting injury." *Glowka v. Bemis*, No. 12-345, 2015 WL 686564, at *8 (S.D. Ohio Feb. 18,

---

Relatedly, the Court concludes that Plaintiff has failed to provide evidentiary support for her suggested claim that Moll failed to intervene to prevent Gravis from engaging in acts of excessive force. First, as discussed above, Plaintiff has alleged that Moll directly engaged in the excessively forceful treatment in the bathroom. Second, Plaintiff provides no evidentiary support for a failure to intervene claim, which requires proof of both opportunity and means to intervene. Plaintiff merely states that, if the Court finds that Moll did not touch Plaintiff, the Court should find a genuine issue of material fact that Moll "could have intervened and stopped the excessive force from being used against Plaintiff." Plaintiff offers absolutely no evidence in support of this bald assertion and makes no effort to explain how Moll had the opportunity or the means to do so. Pl.'s Resp. 23. Indeed, according to Gentry, the entire bathroom event lasted approximately 20 seconds, casting doubt on a claim that there was an opportunity to intervene. Against this evidentiary backdrop, Plaintiff's failure to intervene claim fails to create a triable issue of fact.

23

2015) (finding it well established that picking a handcuffed suspect up in a manner that aggravates a pre-existing injury of which the officer is made aware amounts to excessive force) (citing *Solovy v. Morabito*, 375 F. App'x 521, 527 (6th Cir. 2010) and *Jones v. Garcia*, 345 F. App'x 987, 989 (6th Cir. 2009)).

Although Gravis and Moll each deny that either of them engaged in these acts of excessive force, the Court at this stage must accept Plaintiff's version of the facts unless they are "utterly discredited" by the record so clearly that no reasonable juror could accept the Plaintiff's version of the facts. *Glowka*, 2015 WL 686564, at *10 (quoting *Scott*, 550 U.S. at 380). No such evidence has been presented in this case. Viewing the facts in the light most favorable to the Plaintiff, which the Court is required to do on summary judgment, a reasonable juror could conclude that Gravis and/or Moll exerted excessive force in their efforts to subdue and handcuff Plaintiff in the bathroom of her home. Because Plaintiff's right to be free from such gratuitous acts of excessive force was clearly established, qualified immunity does not preclude Plaintiff from proceeding on her excessive force claim. *Schreiber*, 596 F.3d at 333. Accordingly, the Court DENIES Gravis and Moll's motions for summary judgment on Plaintiff's claim that they used excessive force against her in the bathroom/hallway of her home.

### 2. Viewing the facts in the light most favorable to the Plaintiff, a reasonable juror could conclude that Gravis exerted excessive force in the walk to the patrol car.

Although Moll testified that both he and Gravis walked Plaintiff out to the patrol car, Moll Dep. 34, Plaintiff testified that only Gravis escorted her to the patrol car and her claims as to this period of time are leveled only against Gravis. Pl.'s Dep. 194-95. Plaintiff claims that Gravis pushed and shoved her and continued to pull her by her hair as he escorted to her to the patrol car, all while she was handcuffed behind her back. Pl.'s Dep. 194, 221-24. "A police officer uses

24

excessive force in arresting a suspect if his actions are objectively unreasonable given the nature of the crime and the risks posed by the suspect's actions." *Smith v. Stoneburner*, 716 F.3d 926, 933 (6th Cir. 2013) (citing *Graham v. Connor*, 490 U.S. at 397). "'Cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest.'" *Griffith v. Coburn*, 473 F.3d 650, 659 (6th Cir. 2007) (quoting *Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006)); *Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010) ("[S]triking a neutralized suspect who is secured by handcuffs is objectively unreasonable."). "*[D]e minimus* or inconsequential' resistance does not justify a substantial use of force." *Meirthew v. Amore*, 417 F. App'x 494, 498 (6th Cir. 2011) (finding that plaintiff's refusal to stand against the wall and spread her legs did not justify an arm bar take down where plaintiff was already handcuffed and in the police station).

If events transpired as Plaintiff claims as Gravis escorted Plaintiff to the patrol car, his continued shoving and pushing and pulling on her arms and her hair would be objectively unreasonable under the circumstances he faced. The evidence is simply insufficient to "utterly discredit" Plaintiff's version of the facts, which the Court must accept as true at the summary judgment stage. "Any dispute about whose account is right is for the jury." *Stoneburner*, 716 F.3d at 934 (finding that plaintiff's claims that officers refused to loosen his handcuffs and that he suffered a sprained wrist as a result were sufficient to create a question of fact even though officers testified that they did loosen the handcuffs when plaintiff complained). Accordingly, the Court DENIES Gravis's motion for summary judgment on Plaintiff's claims of excessive force while she was being escorted to the patrol car.

### 3.      Plaintiff's § 1983 excessive force claims are not barred by *Heck*.

Defendants suggest, however, that Plaintiff cannot deny that she was assaultive and actively resisted efforts to subdue her, justifying the Defendant officers in using force to bring her under control, based on her conviction for resisting arrest and that therefore her claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994).[4]  Defendants erroneously state that Plaintiff pled "guilty" to the

---

[4] At the outset of the discussion of *Heck*, the Court notes that there is a threshold issue, not raised by either party, as to whether *Heck's* favorable termination requirement can be imposed in this case because Plaintiff spent only three nights in jail as a result of her conviction for resisting and obstructing, *see* Nelson Dep. at 53, depriving her of a habeas corpus option for vindicating her rights. In *Powers v. Hamilton County Pub. Defenders Comm'n*, 501 F.3d 592, 603 (6th Cir. 2007), the Sixth Circuit ruled that *Heck* was inapplicable because the plaintiff was foreclosed from challenging his incarceration in a habeas corpus action due to the short term (he was imprisoned for fewer than thirty days) of his incarceration, which effectively prevented him from meeting the "in custody" requirement for habeas review.  In *Powers*, Powers pleaded no contest to a charge of reckless driving, was convicted, and sentenced to thirty days of incarceration. 501 F.3d at 596.  The court suspended 27 of those days and ordered Powers to pay a fine and participate in a driver intervention program.  *Id*.  Two months later, Powers was arrested for violating his probation, in part for failing to pay the court-ordered fine.  *Id*.  The court reinstated Powers's thirty day sentence, minus time served, and Powers then spent some portion of the 27 days behind bars.  *Id*. Powers then sued the public defenders office under § 1983 asserting (among other claims) that he had been deprived of an indigency hearing. *Id*.  The public defender argued that Powers's claim was barred by *Heck* because his conviction and sentence had never been set aside.  *Id*. at 599.  Powers argued that *Heck* did not bar his claims because he was precluded, by the short duration of his incarceration, from challenging the legality of his conviction through a habeas proceeding.  The Sixth Circuit agreed.  Applying *Heck* in such a situation, the Sixth Circuit reasoned, would altogether deny the plaintiff a federal forum for vindication of a federal constitutional right.  *Id*. at 600-01. Acknowledging a circuit split on the issue, the Sixth Circuit joined those circuits "that have held that *Heck's* favorable-termination requirement cannot be imposed against § 1983 plaintiffs who lack a habeas option for vindication of their federal rights."  *Id*. at 603.  Construing the Supreme Court's decision in *Spencer v. Kemna*, 523 U.S. 1 (1998) as limiting the reach of *Heck*, the Sixth Circuit held that a plaintiff who had been imprisoned "for at least one, but not more than thirty, days" has no way of "obtain[ing] habeas review for his incarceration," and thus is not precluded by *Heck's* favorable termination requirement from filing a claim under § 1983.  *Id*.  Here Plaintiff's term of imprisonment, three days, rendered her "habeas ineligible" and under the reasoning of *Powers*, *Heck* may be inapplicable.  Because Plaintiff never articulates a *Powers* argument, and because the Court finds *Heck* inapplicable for other reasons, the Court need not guess at whether Plaintiff would have a persuasive *Powers* argument here.  *See Hayward v. Cleveland Clinic Foundation*, 759 F.3d 601, 614-15 (6th Cir. 2014) (acknowledging plaintiff's *Powers* argument as a question of law, the

26

charge of resisting arrest.  This is false.  Plaintiff pled "no contest" to a charge of attempting to resist arrest and expressly struck the word "guilty" on the Plea Form and wrote in the words "No Contest" in each instance. Defs.' Amended Ex. 7.

As the Sixth Circuit clearly held in *Schreiber v. Moe*, 596 F.3d 323 (6th Cir. 2010), a case that also involved a no contest plea, when analyzing whether plaintiff's § 1983 claim was barred by *Heck*, "[t]he mere fact that the conviction and the § 1983 claim arise from the same set of facts is irrelevant if the two are consistent with each other." *Id*.  The underlying inquiry is whether "the § 1983 suit seeks a determination of a fact that, if true, would have precluded the conviction." *Id*.  The Court in *Schreiber* analyzed the *Heck* bar as it related to the very same provision of the Michigan resisting arrest statute at issue here and concluded that nothing in the text of that statute, Mich. Comp. Laws § 750.81d(1), suggests that the state must prove as an element of the crime that the police did not use excessive force.  Indeed, as the Sixth Circuit noted in *Schreiber*, "the Court of Appeals of Michigan [] found that a lawful arrest is not one of the elements of § 750.81d(1)" in *People v. Ventura*, 262 Mich. App. 370 (2004).  *Id*.  Moreover, the court noted in *Schreiber*, Michigan case law suggested "that excessive force by the police is not a defense to a resisting-arrest conviction." *Id*. (citing *People v. Hill*, No. 283951, 2009 WL 1830750, at *3 (Mich. Ct. App. June 25, 2009)) (finding no "authority to indicate that the alleged use of excessive force by police is a valid defense to resisting and obstructing" under the Michigan statute).  *See Shirley v. City of Eastpointe*, No. 11-14297, 2013 WL 4666890, at *7 (E.D. Mich. Aug. 30, 2013) ("[I]in addition to the ruling in *Schreiber*, a number of Sixth Circuit and Eastern District of Michigan decisions

---

resolution of which was not clear beyond doubt, but declining to address the argument because plaintiff did not raise it in the court below).

recognize that a conviction for resisting and obstructing a police officer does not preclude a plaintiff, whether under *Heck* or principles of estoppel, from pursuing a § 1983 claim of excessive force arising out of the arrest that led to the plaintiff's conviction.")  Thus, it is clear that, if *Schreiber* and *Ventura* were controlling, *Heck* would not bar Plaintiff's excessive force claims here.[5]

Nor, as the Sixth Circuit recognized in *Miller v. Village of Pinckney*, 365 F. App'x 652 (6th Cir. 2010), can Defendants attempt to rely on preclusion principles in this case given the nature of Plaintiff's no contest plea:

> The analysis does not change simply because the factual predicate for her no-contest plea may have included facts she now disputes, such as the state court's statement that she resisted arrest by "[going] limp" and falling to the ground. R.36–17, 14. The relevant inquiry for determining if *Heck* poses a bar is whether success on her excessive-force claim would necessarily "negate an element of the offense," *Heck*, 512 U.S. at 487 n. 6, 114 S.Ct. 2364 (emphasis added), not whether it would cast doubt on facts the state court might or might not have relied on when accepting the plea. Miller admitted no facts when she pleaded no contest. *See People v. Graham*, 55 Mich. App. 590, 223 N.W.2d 80, 82 (1974). And her resisting-and-obstructing conviction could stand based on any number of actions she took that night—from "yelling, screaming, kicking," to "refus[ing] orders." R.36–17, 15; *see* Mich. Comp. Laws 750.81d (broadly defining the offense as "the use or threatened use of physical interference or force or a knowing failure to comply with a lawful command"). In raising her § 1983 claim, then, she is free to argue (though she does so unconvincingly) that she did not "go limp" without running up against the possibility that success on her claim that Shepard kneed her to the ground might undermine her conviction.

365 F. App'x at 655.  The court in *Shirley*, *supra*, recognized and applied these same principles on facts very similar to those presented here.  In *Shirley*, as here, the Plaintiff pled no contest to a

---

[5]  By contrast, as the court noted in *Shirley*, a false arrest, false imprisonment or malicious prosecution claim asserted under § 1983 would be precluded by *Heck* because the state-court convictions, which necessarily were premised on a finding of probable cause, would preclude plaintiff from establishing the absence of probable cause that is an essential *element* of a § 1983 claim for false arrest, false imprisonment or malicious prosecution.  2013 WL 4666890, at *7.  For this reason, Plaintiff in this case cannot assert a claim of false arrest or false imprisonment.  *See infra* discussion at IIID.

charge of resisting under the Michigan statute and stipulated at the plea hearing to the facts set forth in the police report. 2013 WL 4666890, at *8. Chief Judge Rosen rejected defendants' contention that plaintiff was precluded from contesting or relitigating these facts in his § 1983 claim of excessive force, even though some of the facts may have been inconsistent with his claim of excessive force:

> Next, as a variation on their appeal to *Heck*, Defendants suggest that Plaintiff's claim of excessive force is defeated by principles of collateral estoppel or judicial estoppel, in light of the admissions purportedly made by Plaintiff in connection with his plea of no contest to a state-law charge of resisting and obstructing a police officer. . . . The lynchpin of this appeal to principles of estoppel, however, is that by virtue of Plaintiff's plea of no contest and the stipulation given by his counsel at the state court plea hearing, Plaintiff admitted to facts which are inconsistent with his § 1983 claim of excessive force. Indeed, in the brief in support of their motion, Defendants flatly assert that under Michigan law, "a no contest plea is an admission to the factual basis for the criminal charge." (Defendants' Motion, Br. in Support at 11.) Yet, in the case cited by Defendants as support for this proposition, the Michigan Court of Appeals states precisely the opposite, explaining that although a plea of no contest "subjects a defendant to all the consequences of a conviction, a defendant, by so pleading, does not admit the facts constituting the crime charged." *People v. Graham*, 55 Mich. App. 590, 223 N.W.2d 80, 82 (1974) (emphasis added). Additional case law identified in the Court's own research confirms this principle of Michigan law. *See, e.g., Lichon v. American Universal Insurance Co.*, 435 Mich. 408, 459 N.W.2d 288, 298 (1990) (explaining that "[t]he taking of [a] nolo contendere plea cannot be considered 'actual litigation,' at least not in terms of collateral estoppel jurisprudence," because "[t]he essence of a nolo contendere plea is in its name, 'nolo contendere,' or 'I will not contest it,' " and "[i]f the charges are uncontested, they are necessarily unlitigated"); *Miller*, 365 F. App'x at 655 (observing that the plaintiff in that case "admitted no facts when she pleaded no contest" (citing *Graham*)); *Blackburn v. Grai*, No. 08–11597, 2009 WL 3164715, at *7 (E.D. Mich. Mar.11, 2009), adopted in 2009 WL 3125872, at *3 (E.D. Mich. Sept. 28, 2009); *Green*, 2005 WL 2739378, at *6. This clear Michigan law governing pleas of no contest defeats Defendants' effort to rely on the stipulations of counsel at Plaintiff's state court plea hearing as a basis for arguing that Plaintiff is barred from "relitigating" the facts surrounding his October 2, 2009 arrest.

2013 WL 4666890, at *8. *See also Gottage v. Rood*, 533 F. App'x 546 n. 2 (6th Cir. 2013) (noting that plaintiff's no contest plea to resisting and obstructing, which adopted the police report as the

factual basis for the plea, was not definitive evidence that the amount of force used was reasonable but only one fact for the jury to consider in determining the reasonableness of the force used by officers); *People v. Graham*, 55 Mich. App. 590, 593 (1974) (although "a plea of nolo contendre subjects a defendant to all the consequences of a conviction, a defendant, by so pleading, does not admit the facts constituting the crime charged"). Thus, if *Heck* poses no bar to Plaintiff's § 1983 excessive force claim, her no contest plea, which adopts the facts set forth in the police report, will not operate as an independent bar to that claim.

Because of the timing of Plaintiff's plea, however, the Court is compelled to explore an element of the *Heck* analysis that may be complicated by the Michigan Supreme Court's decision in *People v. Moreno*, 491 Mich. 38 (2012). Although *Ventura* was the law at the time of Plaintiff's arrest on February 4, 2012, *Moreno*, decided on April 20, 2012, not *Ventura*, was the law at the time of Plaintiff's July 13, 2012 plea and therefore the Court applies *Moreno*. *See Cummings v. Lewis*, No. 303386, 2012 WL 2579678, at *2, n. 3 (Mich. Ct. App. July 3, 2012) (rejecting the invitation to bar plaintiff's excessive force claim under *Heck* based on *Moreno* when "*Ventura* was law at the time of plaintiff's plea"). *See also Henry v. City of Eastpointe Police Dep't*, No. 11-cv-10192, 2013 WL 1395851, at*10 (E.D. Mich. March 7, 2013) (Komives, MJ) (finding that plaintiff's excessive force claim was not barred under *Heck* and noting that whatever merit *Moreno* might lend to a *Heck* claim was irrelevant as *Ventura*, not *Moreno*, was the governing law when plaintiff was convicted). Were this Court analyzing Plaintiff's claims under *Schreiber* and *Ventura*, when the law in Michigan was clear that lawfulness of an arrest was not an element of the charge of resisting and excessive force was not an affirmative defense, there would be no question that Plaintiff's claims are not barred by *Heck*. Ample precedent discussed *supra* clearly establishes this result. However, due to

30

the timing of the plea in this case, which was entered on July 13, 2012, after the Michigan Supreme

Court's decision in *Moreno*, the Court must address what appears to be a possible unsettled issue

of Michigan law.

In *Moreno*, the Michigan Supreme Court overruled *Ventura*, and held that lawfulness of the

underlying arrest *is* an element of the charge of resisting under § 750.81d.  *See People v. Quinn*, 305

Mich. App. 484, 492 (2014) (holding that post-*Moreno*, "the prosecution must establish that the

officers acted lawfully as an actual element of the crime of resisting or obstructing a police officer

under MCL 750.81d.").   The court in *Moreno* reaffirmed the longstanding principle of law in

Michigan that individuals have an inherent right to resist an unlawful arrest and held that, to the

extent it concluded otherwise, *Ventura* was wrongly decided.  The court reasoned in *Moreno* that

the Michigan legislature did not intend to abrogate that common law right to resist an unlawful arrest

when it amended the Michigan resisting statute in 2002.  491 Mich. at 631-32.

An issue that *Moreno* left unanswered, however, is how Michigan courts will now define

"lawfulness" in the context of a charge of resisting arrest under the Michigan statute.  The definition

of "lawfulness" under the Michigan resisting statute will dictate the necessary elements of that crime

and will thus determine the extent to which a later claim under § 1983 will be barred by *Heck*.

"Whether success on a § 1983 claim will undermine an underlying criminal conviction for resisting

arrest, therefore, hinges on the meaning of 'lawful arrest.'"   *Hayward v. Cleveland Clinic*

*Foundation*, 759 F.3d 601, 609 (6th Cir. 2014)

The law in this Circuit interpreting *Heck* is clear: "[I]f a plaintiff asserts a claim that

contradicts an element of the underlying criminal offense, or if that claim could have been asserted

in criminal court as an affirmative defense, *Heck* applies to bar the § 1983 suit."  *Hayward*, 759 F.3d

at 609.  Specifically, to reiterate, in the context of a claim of excessive force, "to come within the *Heck* exception on an excessive force claim, either (1) the criminal provision must make lack of excessive force an element of the crime or (2) excessive force must be an available affirmative defense to the crime."  *Schreiber*, 596 F.3d at 334.  Prior to *Moreno*, when *Ventura* was the law and lawfulness was not an element of a charge of resisting arrest under the Michigan statute, *Schreiber* and numerous cases applying *Schreiber* conclusively found that neither of these applied to a charge of resisting arrest under the Michigan statute and therefore *Heck* did not operate to bar an excessive force claim following a conviction for resisting arrest under the Michigan statute.

Post-*Moreno*, it is clear that lawfulness *is* now an element of the crime of resisting arrest, *i.e.* the common law right to resist an unlawful arrest has been resurrected in Michigan.  Prior to *Moreno*, the Sixth Circuit suggested in *Schreiber*, relying on *Ventura*, that the absence of a lawfulness requirement to a charge of resisting under the Michigan statute supported the conclusion that the state was not required to prove as an element of the crime of resisting arrest that the police did not use excessive force:

> Nothing in the text of Michigan Compiled Laws § 750.81d(1) or § 750.92 suggests that the state must prove as an element of the crime that the police did not use excessive force. Indeed, the Court of Appeals of Michigan has found that a lawful arrest is not one of the elements of § 750.81d(1). *People v. Ventura*, 262 Mich. App. 370, 686 N.W.2d 748, 752 (2004).

596 F.3d at 334.  The Sixth Circuit also observed that Michigan case law "strongly suggested that excessive force by the police is not a defense to a resisting-arrest conviction," thus precluding the Sixth Circuit from concluding that excessive force by the officer would have provided Schreiber with an affirmative defense.  *Id*. at 334-35.

32

The "unsettled" issue then that this Court confronts is how, if at all, the introduction of a lawfulness requirement to a charge of resisting arrest under the Michigan statute affects the *Heck* analysis of Plaintiff's excessive force claim.  In short, if lawfulness is now an element of the crime of resisting, is "lawfulness" to be defined as an arrest without excessive force, so that a necessary element of the crime of resisting is proof of a lack of excessive force? If the answer is yes, then a § 1983 claim of excessive force *would* negate an element of the crime to which Plaintiff pleaded guilty and *would* be barred by *Heck.*  Even if the lack of excessive force is not an express element of the crime of resisting by virtue of the holding in *Moreno*, does *Moreno* suggest that  excessive force is now an affirmative defense to the crime of resisting?  If yes, then under the second scenario recognized in *Schreiber*, Plaintiff's excessive force claim would be barred by *Heck*.

> **a.** **Nothing in the history of Michigan law interpreting the Michigan resisting statute suggests to this Court that Michigan courts will interpret *Moreno* to now require proof of the absence of excessive force as an element of the crime of resisting arrest.**

As the Sixth Circuit concluded in *Schreiber*, "[n]othing in the text of [the Michigan resisting statute] suggests that the state must prove as an element of the crime that the police did not use excessive force."  596 F.3d at 334 (alteration added).  Nothing in that text has changed.  What has changed is the judicial interpretation of that statute, which now requires proof of lawfulness as an element of the offense of resisting arrest.  *Moreno* arose in the context of a warrantless entry into the defendant's home.  Officers demanded entry into the home after observing suspected underage drinking inside the home.  Defendant refused to permit the officers to enter without a warrant.  491 Mich. at 42-43.  A struggle ensued between defendant and the officers, resulting in the officers physically subduing the defendant in order to gain entry to the home.  *Id.* at 43.  Defendant suffered a torn hamstring and an elbow injury in the course of the scuffle.  Defendant was charged with

33

assaulting, resisting, or obstructing in violation of § 750.81d(2) and moved to quash the charges, claiming that officers unlawfully entered his home. *Id.* The trial court, finding no evidence of exigent circumstances, concluded that the officers had illegally entered the home. "Nevertheless, the trial court concluded that a "lawful" action by an officer [was] not a requirement of MCL 750.81d and, therefore, denied defendant's motion to quash the charges." *Id.* The Court of Appeals, applying *Ventura*, affirmed the trial court, concluding that "the officers' conduct in forcibly entering the home did not have to be lawful in order for defendant to be charged under MCL 750.81d." *Id.* at 43-44.

The Michigan Supreme Court reversed. Specifically, the Michigan Supreme Court observed that in amending the prior version of Mich. Comp. Laws § 750.81d, "the Legislature retained the concept that the offense of resisting and obstructing requires that an officer's actions are lawful." *Id.* at 633. *Moreno* thus expressly "overrule[d] *Ventura* to the extent that it concluded that the common-law right to resist an unlawful arrest was abrogated by MCL 750.81d," and thereby reaffirmed that lawfulness of an arrest *is* an element of the crime of resisting. *Id.* at 634.

Michigan courts define "lawfulness" in terms of probable cause. "For an arrest to be lawful, the police officer making the arrest must have probable cause . . . ." *People v. Vandenberg*, 307 Mich. App. 57, 69 (2014). *City of Westland v. Kodlowski*, 298 Mich. App. 647 (Mich. 2013), reversed in part by *City of Westland v. Kodlowski*, 495 Mich. 871 (2013) (noting that because there was probable cause to arrest, the Court of Appeals had no occasion to discuss the applicability of *Moreno*).[6] This Court has searched for, but has been unable to find, Michigan case law that also

---

[6] In *Kodlowski*, the Michigan Supreme Court vacated only that portion of the Court of Appeals' decision that analyzed the potential applicability of *Moreno*. Specifically, the Court of Appeals had discussed whether the defendant could assert a defense based on *Moreno* that he resisted "an arrest

defines "lawfulness" with reference to the amount of force used by the arresting officer in effectuating an arrest. The Michigan Supreme Court's opinion in *Kodlowski*, vacating that portion

---

that was made unlawful because of excessive force used by the officers." 298 Mich. App. at 670. Although the Court of Appeals ultimately held that *Moreno* had limited retroactive application and therefore was not available to this defendant because he did not preserve the issue in the trial court, the opinion at least suggested the possibility that excessive force might have been at least an affirmative defense to the charge of resisting and specifically quoted the following language from *People v. Baker*, 127 Mich. App. 297, 299 (1983): "Defendant did not deny that he used force to resist the arrest. Rather, he claimed that the arrest was unlawful in that the degree of force used by the officer was excessive. Those claims, if believed, would have constituted a defense to the charge." 298 Mich. App. at 670 n. 11. *See also People v. Rauch*, No. 263185, 2006 WL 3682754, at *3 (Dec. 14, 2006) (noting that pre-*Ventura* "a claim that an arrest was unlawful because the degree of force was excessive was a defense to the charge" of resisting). However, in issuing an opinion for the sole purpose of vacating this very portion of the Court of Appeals' opinion, the Michigan Supreme Court appeared to be instructing that *Moreno* would have no application where there was probable cause for the underlying arrest, i.e. where the underlying arrest was lawful:

> As the defendant acknowledged in his testimony that he twice touched Officer Little, probable cause existed to effect his arrest. Therefore, the Court of Appeals had no occasion to discuss or decide the applicability of *People v. Moreno*, or to determine whether, and to what extent, *People v. Moreno* will be given retroactive effect in this or other cases.

495 Mich. at 871. Thus, although the Court of Appeals' discussion of the issue, and in particular its citation to the above-quoted language from *Baker*, suggests that it might consider whether excessive force could be asserted as an affirmative defense to a charge of resisting arrest post-*Moreno*, the Michigan Supreme Court appears to have specifically rejected that concept by issuing an opinion solely for the purpose of rejecting that notion and reiterating that probable cause rendered the underlying arrest lawful and suggesting this could not be "undone" by the officers' use of excessive force. Notably, the case cited in *Baker* as support for the above-quoted language was a case, like *Moreno*, where the officers' underlying entry into a home was unlawful and therefore (because the case was pre-*Ventura*) defendants had a common law right to use force and could not be charged with resisting arrest. *See People of Garden City v. Stark*, 120 Mich. App. 350, 353 (1982). Here, as in *Kodlowski*, Plaintiff admits that she first touched officer Gravis with the bag and she does not claim that she did so in response to Officer Gravis's assaultive conduct. Here Plaintiff pled no contest to her conviction for resisting and obstructing, preventing her from challenging the finding of probable cause for her arrest. *See Walker v. Schaeffer*, 854 F.2d 138, 142 (6th Cir. 1988) (plea of no contest in state court to criminal charges precluded subsequent claim of false arrest in federal court because plaintiff had a "full and fair opportunity to litigate" probable cause issue in state court proceeding).

35

of the Court of Appeals' decision that opined on the applicability of *Moreno* to a charge of resisting

an arrest that was otherwise supported by probable cause, suggests that probable cause remains in

Michigan the sole determinant of "lawfulness." *See supra* discussion at n. 6.  In addition, while the

Court is unaware of a published post-*Moreno* decision of any Michigan court, or another court in

this District or the Sixth Circuit interpreting Michigan law, addressing the issue of whether the

absence of excessive force is now an element of the crime of resisting arrest, two recent unpublished

opinions suggest that Michigan courts will not interpret *Moreno* as now requiring the definition of

"lawfulness" to include proof of the absence of excessive force.

In *Cummings*, *supra*, the Michigan Court of Appeals, while avoiding a decision on the issue

because *Ventura,* not *Moreno,* was the law at the time of the plaintiff's plea, expressed the following

view:

> *Moreno* does not stand for the proposition that excessive force is an affirmative
> defense to resisting a lawful arrest.  Rather it stands for the rule that MCL 750.81d
> did not abrogate the common-law right to resist *unlawful* arrests and unlawful
> entries.  Thus, defendant would have this Court hold that use of excessive force
> renders an arrest unlawful.  Defendant does not cite any case law in support of this
> proposition, and we do not read our Supreme Court's decision in *Moreno* to compel
> such a ruling.

2012 WL 2579678, at *2 n. 3 (emphasis in original).  While this opinion speaks also to the issue of

whether excessive force is now an affirmative defense to a charge of resisting, a separate issue

discussed *infra*, it also directly suggests that *Moreno* does not support the proposition "that the use

of excessive force renders an arrest unlawful."

More recently, in *People v. Rolland*, No. 322788, 2015 WL 9258236 (Dec. 17, 2015), the

Michigan Court of Appeals, in a *per curiam* opinion, discussed the limited holding of *Moreno*,

suggesting that an arrest supported by probable cause is not rendered "unlawful" by an officer's use

36

of excessive force in making the arrest. While this case also discusses the availability of excessive force as an affirmative defense to a resisting arrest charge, a separate issue discussed *infra*, the opinion also suggests that lawfulness of an arrest is defined by the probable cause that supported it and that excessive force used in effectuating a lawful arrest does not negate that lawfulness. Defendant in *Rolland* was convicted by a jury of resisting arrest, malicious destruction of property and domestic violence. Defendant appealed his conviction, arguing that the trial court erred in failing to instruct the jury regarding defendant's defense to the resisting charge, based upon *Moreno*, that the officers' use of excessive force in effectuating his arrest rendered the arrest unlawful. *Id.* at *1. The Court of Appeals disagreed, explaining that the common-law right to resist an unlawful arrest resurrected in *Moreno* only arises where the initial arrest is unlawful:

> In the wake of *Moreno*, "the prosecution must establish that the officers acted lawfully as an actual element of the crime of resisting or obstructing a police officer under MCL 750.81d." *People v. Quinn*, 305 Mich. App. 484, 492; 853 NW2d 383 (2014). However, and significantly, defendant does not challenge the conclusion that the arrest was valid based on probable cause that he committed domestic violence against his wife. Further, the record demonstrates that there is no reason to doubt that probable cause existed to make the arrest. *See People v. Mitchell*, 138 Mich. App 163, 167; 360 NW2d 158 (1984) (stating that in determining whether probable cause existed for an arrest, a "reviewing court must determine whether facts available to the officer at the moment of arrest would justify a fair-minded person of average intelligence in believing that the suspected person" committed a crime).

> Defendant claims that the arrest was rendered unlawful by the claimed use of excessive force on the part of the police. However, the common-law right to resist an unlawful arrest arises where the initial arrest itself was unlawful. *See, e.g., Moreno*, 491 Mich. at 43 (involving an unlawful, warrantless entry into defendant's home); *People v. Krum*, 374 Mich. 356, 360; 132 NW2d 69 (1965) (considering the defendant's assertion that there was no probable cause to stop and search his car); *Quinn*, 305 Mich. App at 493 (addressing whether the officers had a sufficient reasonable suspicion to justify the detention); and *Ventura*, 262 Mich. App at 372–373 (addressing whether an officer could make a legal arrest in the defendant's home). To the extent defendant attempts to use nonbinding case law to persuade us that a defendant is allowed to argue "excessive force" as an affirmative defense to a resisting-arrest charge when the initial arrest itself was lawful, we reject this

37

attempt.

2015 WL 9258236, at *3.  In a footnote, the Michigan Court of Appeals noted that "a defendant is not without recourse if an instance of excessive force occurs during a lawful arrest. Indeed, a defendant may request a prosecutor to press charges against the police or may initiate a civil lawsuit."  *Id*. at *4 n.3.

These two post-*Moreno* cases, although unpublished, strongly suggest to this Court that Michigan courts would not interpret *Moreno* to have created such a sea change in the interpretation of the Michigan resisting statute as to now require the state to prove in each case, in addition to probable cause, that the officers acted with a reasonable degree of force.  This conclusion is further buttressed by the Sixth Circuit's discussion of this issue in *Hayward*, *supra*, in which the court was called upon to interpret the Ohio resisting statute, which has long required "as an element of the offense [of resisting] a 'lawful arrest.'" *Hayward*, 759 F.3d at 609 (alteration added).  Under Ohio law, an individual cannot be convicted under the state resisting statute of resisting an unlawful arrest.  *Id*.  The Sixth Circuit noted in *Hayward* that lawfulness of an arrest under Ohio law generally is based on the existence of probable cause and that excessive force, while it may give rise to civil remedies or criminal defenses, "does not negate the legal nature" of an arrest or detention.  759 F.3d at 610.  The Sixth Circuit also noted, however, that Ohio courts are in conflict over whether a "lawful arrest" can occur if the arresting officer used excessive force, i.e. the courts are in disagreement over whether the lack of excessive force is an element of the crime that must be established for a conviction.  *Hayward*, 759 F.3d at 610 (collecting cases holding both that excessive force in effectuating an arrest renders the arrest unlawful under Ohio law and cases holding the

opposite, that lack of excessive force is not an element of resisting arrest).[7]  While the Sixth Circuit did not have to resolve this conflict given its resolution of the related issue that excessive force is an affirmative defense under Ohio law to a charge of resisting, a close examination of those Ohio cases cited by the Sixth Circuit as having created the "conflict" over whether excessive force is an element of the charge of resisting reveals that the better reasoned and more widely adopted view of the Ohio courts is that lack of excessive force is not an element of the crime of resisting even in Ohio, where lawfulness has long been an element of the crime of resisting arrest.  While this Court is certainly not obliged to resolve or even to weigh in on this Ohio conflict, the solid reasoning of these cases informs this Court's consideration of this issue under the Michigan resisting statute.

For example, in *State v. Ellis*, No. 24003, 2011 WL 2436939 (Ohio Ct. App. June 17, 2011), the Ohio Court of Appeals explained:

> {¶ 24} The resisting-arrest statute prohibits a person from resisting a "lawful arrest." R.C. 2921.33(A). Ellis argues that the state failed to prove that his arrest was lawful because it failed to prove that Officer Cope did not use excessive force. Ellis contends that, as a matter of law, the use of excessive force by an arresting officer renders the arrest unlawful. Since "lawful arrest" is an element of the offense, Ellis reasons, it is the state's burden to prove that the arresting officer did not use excessive force.

> {¶ 25} Excessive force is not an element of resisting arrest. Undoubtedly, "'[a] lawful arrest is an essential element of the crime of resisting arrest,'" which the state must prove. *State v. Burns*, Montgomery App. No. 22674, 2010–Ohio–2831, at ¶ 29,

---

[7]  The Sixth Circuit in *Hayward* did not have to resolve this conflict, however, because unlike in Michigan, it has also been long and clearly established in Ohio that excessive force is an affirmative defense to a charge of resisting arrest, thus bringing cases decided under Ohio law squarely within the second *Heck* exception.  759 F.3d at 610-11. Indeed, "[a] number of Ohio courts have echoed this perspective, finding that excessive force is an affirmative defense that a criminal defendant must raise in response to a charge of resisting arrest." *Id.* at 611.  "Therefore, a criminal conviction for resisting arrest in Ohio cannot stand where a criminal defendant successfully asserts the affirmative defense of pre-arrest excessive force; and a § 1983 claim of excessive force would necessarily imply the invalidity of an underlying conviction for resisting arrest." *Id.*

quoting *State v. Vactor*, Lorain App. No. 02CA008068, 2003–Ohio–7195, at ¶ 34. But "lawful arrest," in this context, refers only to the underlying reason for the arrest: "In order to prove a lawful arrest, * * * the State must prove both 'that there was a reasonable basis to believe that an offense was committed, [and] that the offense was one for which the defendant could be lawfully arrested.'" *Burns*, at ¶ 29, quoting *Vactor*, at ¶ 34. Although this Court has not previously considered the issue raised here, other districts have, and we agree with their conclusion. The Fourth District has held that "[a] trial court properly refused to instruct the jury that the state must prove, as a part of the element of lawful arrest, the arresting officer did not use excessive or unnecessary force in arresting appellant." *State v. Thompson* (Nov. 9, 1993), Ross App. No. 92CA1906. "The use of excessive force may give rise to civil remedies or criminal defenses," the Fourth District has said, "but it does not negate the legal nature of an accused's detention for Fourth Amendment or concurrent statutory purposes." *Id.* Likewise, the Twelfth District has held that "'the absence of excessive or unnecessary force is not a material element of the crime of resisting arrest as defined in R.C. 2921.33.'" *Blanchester v. Newland* (Sept. 17, 1984), Clinton App. CA83–07–008. . . . Thus, the State's burden is to prove that the initiation of the arrest was lawful. Moreover, subsequent excessive force, for instance on the way to the jail or in the process of booking, should subject officers to civil liability but should not change the character of the defendant's criminal responsibility.

2011 WL 2436939, at *4. Similarly, in *Mansfield v. Studer*, Nos. 2011-CA-93, 2011-CA-94, 2012 WL 4955278 (Ohio Ct. App. Oct. 17, 2012), the Ohio Court of Appeals, citing *Ellis*, concluded that lack of excessive force is not a material element of the crime of resisting arrest:

{¶ 97} Excessive force is not an element of resisting arrest. *State v. Ellis*, 2nd Dist. No. 24003, 2011–Ohio–2967, ¶ 25.

*          *          *

{¶ 98} In addition, the Fourth District Court of Appeals has held that "[a] trial court properly refused to instruct the jury that the state must prove, as a part of the element of lawful arrest, the arresting officer did not use excessive or unnecessary force in arresting appellant." *State v. Thompson* (Nov. 9, 1993), 4th Dist. No. 92CA1906, 1993 WL 472907. "The use of excessive force may give rise to civil remedies or criminal defenses," the Fourth District has said, "but it does not negate the legal nature of an accused's detention for Fourth Amendment or concurrent statutory purposes." *Id. Accord, Ellis*, 2011–Ohio–2967, ¶ 25.

{¶ 99} Likewise, the Twelfth District has held that "the absence of excessive or unnecessary force is not a material element of the crime of resisting arrest as defined

40

in R.C. 2921.33." *Blanchester v. Newland*, 12th Dist. No. CA83–07–008, 1984 WL 3426(Sept. 17, 1984).

*          *          *

{¶ 100} We conclude that the trial court's instruction was proper because excessive force is not an element of the crime of resisting arrest.

2012 WL 4955278, at *15-16.

Although Michigan has no analogous body of case law clearly expressing the view that a lack of excessive force is not an element of the crime of resisting arrest under the Michigan resisting statute, this Court finds that those Michigan courts that have spoken indirectly on the issue post-*Moreno* echo the reasoning of the Ohio Court of Appeals in *Ellis* and *Mansfield*, that the "lawfulness" requirement under the resisting statute requires only a showing that there was a "reasonable basis," or probable cause, supporting the arrest and does not place the burden on the state also to prove that officers acted with a reasonable degree of force when consummating the arrest. Nothing in *Moreno*, or in the Michigan cases that have interpreted *Moreno* as it may relate to this question, *see Cummings* and *Rolland supra*, suggest a different result.

This Court concludes that Michigan courts would not find that *Moreno* compels the conclusion that a lack of excessive force is now an element of the crime of resisting under the Michigan statute. Accordingly, success on Plaintiff's § 1983 claim for excessive force would not necessarily imply the invalidity of her conviction for resisting arrest.

      **b.** **Unlike the clear body of law in Ohio holding that excessive force is an affirmative defense to a charge of resisting arrest under the Ohio statute, several Michigan cases suggest that no such defense is available under the Michigan statute and, without a clear directive from Michigan courts, this Court finds no solid ground for departing from the Sixth Circuit's conclusion in *Schreiber* that excessive force is not an affirmative defense to a charge of resisting under the Michigan statute.**

41

It has long been established in Ohio that an officer's use of excessive force is an affirmative defense to a charge of resisting arrest under the Ohio statute. *See Ellis*, 2011 WL 2436939, at *4 ("The use of unnecessary or excessive force by the arresting officer is a defense to the charge of resisting arrest.") (alteration, internal quotation marks and citation omitted). Similarly, in *Mansfield*, *supra*, the court explained that excessive force is a defense that can be asserted in response to a charge of resisting arrest under Ohio law:

> [E]xcessive force is an affirmative defense to resisting arrest, see 2 Ohio Jury Instructions (2009), Section 521.33(11), citing as authority *State v. Logsdon*, 3rd Dist. No. 13–89–10, 1990 WL 197883(Dec. 4, 1990). *Logsdon* holds that "a claim of unnecessary or excessive force must be regarded as an affirmative defense to a charge of resisting arrest." It points out that the defense fits the second statutory-definition of an affirmative defense, "The defense is peculiarly within the knowledge of the defendant because only the defendant can adequately demonstrate to the trier of fact the point at which he felt he had to protect himself from the actions of the arresting officer." *Id.* "With an allegation of unnecessary or excessive force in a resisting arrest charge," says *Logsdon*, "a defendant attempts to excuse or justify his actions in the classic nature of an affirmative defense, *i.e.* 'confession and avoidance.'" *Id.* "Thus," *Logsdon* continues, "the defendant effectively admits his resistance, if only to show that it was necessary in order to protect himself from the officer's excessive force." *Id. Accord, Ellis*, 2011–Ohio–2967, ¶ 26.

2012 WL 4955278, at (alteration added). Other states similarly have created such a defense to a charge of resisting arrest, either by judicial doctrine or by statute. *See, e.g. Parvin v. Campbell*, __F. App'x__, 2016 WL 97692, at *4 (6th Cir. Jan. 8, 2016) (recognizing that "under Tennessee law, an officer's excessive use of force is a defense to a charge of resisting or evading," citing to both Tennessee's resisting and self defense statutes, and concluding that "thus a guilty plea and resultant conviction of such a charge necessarily includes a finding that the officer did not use excessive force"). No such doctrine has been firmly established under Michigan's resisting statute.

The Sixth Circuit in *Schreiber*, decided in 2010, noted that at least one Michigan case then "strongly suggested" that excessive force by police was not a defense to resisting arrest under the

Michigan statute, but observed that other Michigan cases "left the issue unresolved:"

> [O]ne recent Michigan case has strongly suggested that excessive force by the police is not a defense to a resisting-arrest conviction, *People v. Hill*, No. 283951, 2009 WL 1830750, at *3 (Mich. Ct. App. June 25, 2009) (stating that there is no authority for the proposition that the "use of excessive force by police is a valid defense to resisting and obstructing"), and several others have left unresolved the question of whether excessive force is a defense. *See, e.g., People v. Burks*, No. 284467, 2009 WL 1693743, at *2 (Mich. Ct. App. June 16, 2009); *People v. Rauch*, No. 263185, 2006 WL 3682754, *3–4 (Mich. Ct. App. Dec.14, 2006).

596 F.3d at 334-35 (alteration added). "In light of these state court of appeals decisions," the Sixth Circuit in *Schreiber* was unable to "conclude that any excessive force used by Moe would have provided Schreiber with an affirmative defense to the charge of resisting an arrest." *Id*. at 335.

This Court is unaware of any Michigan cases decided since *Schreiber*, including *Moreno*, that would compel a different conclusion now. In fact, both *Cummings* and *Rolland*, discussed *supra*, strongly suggest that the Sixth Circuit drew the appropriate conclusion in *Schreiber* and that it is still the law in Michigan today, unchanged by the decision in *Moreno*. *See Rolland*, 2015 WL 9258236, at *3 ("To the extent defendant attempts to use nonbinding case law to persuade us that a defendant is allowed to argue "excessive force" as an affirmative defense to a resisting-arrest charge when the initial arrest itself was lawful, we reject this attempt."); *Cummings*, 2012 WL 2579678, at *2 n. 3 (noting that *Moreno* simply stands for the proposition that the Michigan resisting statute as amended did not abrogate the common law right to resist unlawful arrests and observing that *Moreno* "does not stand for the proposition that excessive force is an affirmative defense to resisting a lawful arrest").

*Moreno* signals a return to pre-*Ventura* law in the sense that an individual retains the common law right to resist an unlawful arrest, and therefore lawfulness of the arrest is an element of the offense of resisting. As *Rolland* and *Cummings* suggest, however, there is no precedent in

43

Michigan for reading *Moreno* to compel a conclusion that the lack of excessive force is now an element of the crime of resisting or that excessive force is an affirmative defense to a charge of resisting arrest under the Michigan statute, so that a subsequent § 1983 action would necessarily be precluded following a conviction for resisting. And this seems a faithful application of *Heck's* purpose to prevent a "collateral attack on [a] conviction through the vehicle of a civil suit." 512 U.S. at 486-87. As the Seventh Circuit aptly noted in *VanGilder v. Baker*, 435 F.3d 689, 692 (7th Cir. 2006), a case in which the court reversed the trial court and held that plaintiff's § 1983 excessive force claim was not barred by *Heck*, to hold otherwise would preclude every defendant convicted of resisting from ever claiming damages under § 1983 for excessive force, regardless of how outrageous the officer's conduct may have been:

> VanGilder claims that he suffered unnecessary injuries because Baker's response to his resistance-a beating to the face that resulted in bruises and broken bones-was not, under the law governing excessive use of force, objectively reasonable. *See Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *McNair v. Coffey*, 279 F.3d 463, 466-67 (7th Cir. 2002).
>
> Were we to uphold the application of *Heck* in this case, it would imply that once a person resists law enforcement, he has invited the police to inflict any reaction or retribution they choose, while forfeiting the right to sue for damages. Put another way, police subduing a suspect could use as much force as they wanted-and be shielded from accountability under civil law-as long as the prosecutor could get the plaintiff convicted on a charge of resisting. This would open the door to undesirable behavior and gut a large share of the protections provided by § 1983.

435 F.3d at 692.

Plaintiff's conviction for resisting arrest necessarily involved a finding that her arrest was lawful, i.e. was based upon probable cause; it did not also necessarily involve a finding that officers did not use excessive force. Nor could Plaintiff successfully have asserted the officers' alleged use of excessive force as a defense to the charge of resisting. Accordingly, success on Plaintiff's § 1983

44

claim for excessive force would not necessarily imply the invalidity of her state court conviction for resisting arrest and her excessive force claim is not barred by *Heck*.[8]

### B.     Plaintiff's State Law Claim for Gross Negligence Against Gravis and Moll

Plaintiff's gross negligence claim, based on the same allegations that form the basis for her claim of excessive force, must be dismissed.   The Sixth Circuit has clearly held that "gross negligence" is not an independent cause of action for claims that sound in excessive force:

> In Count I of her amended complaint, plaintiff claims that defendants' alleged use of excessive force constituted gross negligence, which is actionable under Mich. Comp. Laws § 691.1407. Although establishing that a governmental official's conduct amounted to "gross negligence" is a prerequisite to avoiding that official's statutory governmental immunity, it is not an independent cause of action. The only cause of action available to plaintiff for allegations of this nature would be for assault and battery. *See, e.g., Van Vorous v. Burmeister*, 262 Mich. App. 467, 687 N.W.2d 132, 143 (2004) ("Thus, plaintiff's claim of gross negligence is fully premised on her claim of excessive force. As defendants correctly note, this Court has rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence. Thus, plaintiff did not state a claim on which relief could be granted.") (citations omitted); *see also Livermore*, 476 F.3d at 408 (rejecting gross-negligence claim against an officer-defendant because it was "undoubtedly premised on the intentional tort of battery" where it was based on a shooting that resulted in death). Therefore, the district court erred in not dismissing plaintiff's state-law gross-negligence claim. As a result, we reverse the district court's decision to deny summary judgment on this claim.

*Bletz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011).  *See also Jackson v. City of Highland Park*, No. 15-10678, 2015 WL 3409013, at *2 (E.D. Mich. May 27, 2015) ("As the Sixth Circuit-relying on

---

[8]  Additionally, it cannot be determined at this stage when Plaintiff's "resistance" occurred.  At a minimum, crediting Plaintiff's version of the facts, some degree of force was used after Plaintiff was handcuffed and was being escorted to the patrol car.  Because of this ambiguity in the sequence of events, the Court cannot say with certainty that success on her excessive force claim would *necessarily* invalidate her no contest plea.  *See Hayward*, 759 F.3d at 612 (holding that *Heck* does not bar § 1983 suits alleging post-arrest excessive force) and *Lucier v. City of Ecorse*, 601 F. App'x 372, 377 (6th Cir. 2015) (holding that *Heck* did not bar plaintiff's excessive force claim where the factual basis of plaintiff's guilty plea, and therefore the timing of his resistance, was unspecified).

Michigan Supreme Court precedent-has explained, '[a]lthough establishing that a governmental official's conduct amounted to 'gross negligence' is a prerequisite to avoiding that official's statutory governmental immunity, it is not an independent cause of action. The only cause of action available for allegations of this nature would be for assault and battery.'" (quoting *Bletz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011)); *Van Buren v. Crawford County*, No. 13-14565, 2014 WL 2217016, at *4 (E.D. Mich. May 29, 2014) (citing *Bletz* and dismissing plaintiff's gross negligence claim); *Dizdarevic v. City of Hamtramck*, No. 13-11207, 2014 WL 7896367, at *5 (E.D. Mich. May 21, 2014) (citing *Bletz* and dismissing plaintiff's gross negligence because "a gross negligence claim cannot be maintained as a separate cause of action but is only relevant in determining whether a governmental actor is entitled to immunity for an intentional tort"); *Shirley*, 2013 WL 4666890, at *14 (citing *Bletz* and dismissing plaintiff's gross negligence claim based upon alleged acts of excessive force which, if accepted as true, were intentional acts giving rise only to a claim of assault and battery).

If a jury concludes that Gravis and Moll pulled Plaintiff's arms up to her shoulder blades after handcuffing her behind her back and pulled her up by her hair and bent back her neck, "such conduct would be considered intentional" and would give rise not to a claim for gross negligence but to a claim for assault and battery. *Jackson*, 2015 WL 3409013, at *3. Accordingly, Plaintiff's gross negligence claim is dismissed.[9]

---

[9]   Plaintiff suggests that her gross negligence claim also is premised on her theory of failure to intervene. As discussed *supra*, Plaintiff has failed to provide an evidentiary basis on which a reasonable juror could conclude that an officer failed to intervene in this case. Plaintiff offers no evidence as to opportunity or means, two essential elements of a failure to intervene claim and in fact testified herself that *both* Moll and Gravis directly participated in the use of force against her. *See Shirley*, 2013 WL 4666890, at *10 (rejecting plaintiff's unsupported failure to intervene claim where both defendants were alleged to have actively participated in the act of excessive force). As

**C.**      **Plaintiff's State Law Claim For Assault and Battery Against Moll and Gravis**

"Under Michigan law an assault is 'an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery.'" *Grawey v. Drury*, 567 F.3d 302, 315 (6th Cir. 2009) (quoting *People v. Nickens*, 470 Mich. 622, 685 N.W.2d 657, 661 (2004)). A battery is defined as " 'an unintentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person.' " *Id.* Plaintiff brings an assault and battery claim against Gravis and Moll and they invoke the defense of governmental immunity.

"Michigan state law imposes a subjective test for governmental immunity for intentional torts, based on the officials' state of mind, in contrast to the objective test for federal qualified immunity. Michigan governmental immunity 'protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent.'" *Brown v. Lewis*, 779 F.3d 401, 420 (6th Cir. 2015) (quoting *Odom v. Wayne Cnty.*, 482 Mich. 459, 760 N.W.2d 217, 228 (2008)) (finding that district court improperly applied an objective reasonableness test in analyzing plaintiff's assault and battery claim). "That malicious intent is defined as 'conduct or a failure to act that was intended to harm the plaintiff . . . [or] that shows such indifference to whether harm will result as to be equal to a willingness that harm will result.'" *Id.* (quoting *Odom*, 760 N.W.2d at 225).

A reasonable juror who accepted Plaintiff's version of the facts could conclude that Gravis and Moll maliciously forced Plaintiff's handcuffed arms above her shoulders, slammed her into the

---

such, there is no evidentiary support for her failure to intervene claim and no support for a gross negligence claim based on a failure to intervene.

bathroom sink and pulled her up by her hair.[10]   Accordingly, Gravis and Moll are not entitled to summary judgment on Plaintiff's assault and battery claim.

### D.   Plaintiff's State Law Claim for False Arrest/False Imprisonment

To prevail on her false arrest claim, Plaintiff must establish that the Defendants "participated in an illegal and unjustified arrest, and that [they] lacked probable cause to do so."  *Walsh v. Taylor*, 263 Mich. App. 618, 626 (2004).  To establish her claim for false imprisonment, Plaintiff must establish "an unlawful restraint on [her] liberty," that "must have occurred without probable cause." *Id*. at 627.  Here, Plaintiff cannot establish that her arrest and confinement occurred without probable cause given her conviction which necessarily rested on a finding of probable cause as articulated by Judge Reader in her March 5, 2012 preliminary examination hearing.  Ms. Nelson was represented by counsel at that hearing and had every opportunity to contest the finding of probable cause (an essential *element* of the resisting arrest charge).  *See Walker v. Schaeffer*, 854 F.2d 138, 142 (6th Cir.1988) (plea of no contest in state court to criminal charges precluded subsequent claim of false arrest in federal court because plaintiff had a "full and fair opportunity to litigate" probable cause issue in state court proceeding).  *See also Marmelshtein v. City of Southfield*, 07-15063, 2009 WL 648499, at *3 (E.D. Mich. March 11, 2009) (noting that the Sixth Circuit continues to uphold the validity of *Walker* and holding that plaintiff's false arrest claim was barred by his state court nolo contendre plea to resisting arrest).  Unlike a subsequent § 1983 excessive force claim, which does

---

[10]  It is important to note that, while Plaintiff's no contest plea may not collaterally estop her from contesting the facts regarding her resistance that underlie her plea, *see supra Village of Pinckney*, 365 F. App'x at 655; *Shirley*, 2013 WL 4666890, at *8, nor is Defendant precluded from defensive use of those facts at trial.  As Judge Rosen noted in *Shirley*, *supra*: "[U]nder *Walker's* reading of Rule 410(a), Defendants may properly appeal to Plaintiff's no contest plea and the statements of his counsel at the state court plea hearing to support their defense against the § 1983 claims asserted by Plaintiff in this case."  2013 WL 4666890, at *8 n. 5.

not necessarily imply the invalidity of a state court nolo contendre plea to resisting arrest, a false arrest claim directly attacks the finding of probable cause that was an essential *element* of the state court conviction. *Id. See also Shirley*, 2013 WL 4666890, at *7 (distinguishing *Walker* where the claim is one of excessive force and not one of false arrest or false imprisonment and collecting cases).

Moreover, in this case, unlike the numerous cases pre-*Moreno* (when lawfulness *was not* an element of the crime of resisting arrest) that relied on principles of collateral estoppel to bar a subsequent false arrest claim following a conviction for resisting arrest, Plaintiff's plea was entered post-*Moreno*, when lawfulness (i.e. the existence of probable cause) *was* an essential element of the crime charged. Accordingly, Plaintiff's false arrest/false imprisonment is also clearly barred by *Heck* because success on her § 1983 false arrest/false imprisonment claim would necessarily negate the finding of probable cause (the element of lawfulness) and would necessarily imply the invalidity of her conviction.

Accordingly, the Court GRANTS Defendants' motion for summary judgment on Plaintiff's false arrest/false imprisonment claim.

### E.     Plaintiff's Claim Against Green Oak Township

A municipality can be held liable under § 1983 where it is shown that a municipal custom or policy is the driving force behind the alleged constitutional violation. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (stating that the drafters of § 1983 intended only to impose liability on a government that "causes" an employee to violate another's rights under color of some official policy). "A municipality or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th

Cir. 2004) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).  To prevail in such a suit, the plaintiff must show that the alleged violation of his federal rights was caused by a municipal policy or custom.  *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).  A plaintiff asserting a § 1983 claim on the basis of municipal custom or policy must identify the policy, connect the policy to the municipality, and show that the specific injury at issue was caused by the execution of that policy.  *Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004).  The causal link must be strong enough to support a finding that the defendants' deliberate conduct can be deemed the "moving force" behind the violation.  *Id.* (quoting *Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001)).

In *Thomas*, the Sixth Circuit identified four ways a plaintiff may prove the existence of an illegal policy or custom.  398 F.3d at 429.  The plaintiff can point to (1) the government's legislative enactments or official policies; (2) actions by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom or practice of tolerating the violation of federal rights by its officers or agents.  *Id.*  Thus, to state a claim against Green Oak Township, Plaintiff must identify official policies, actions of officials with final decision-making authority, a policy of inadequate training or supervision, or a custom or practice of tolerating the violation of federal rights.  Where no formal written policy exists, the critical inquiry is whether there is a policy or custom that although not explicitly authorized "is so permanent and well settled as to constitute a custom or usage with the force of law."  *Jones v. Muskegon County*, 625 F.3d 935, 946 (6th Cir. 2010) (quoting *McClendon v. City of Detroit*, 255 F. App'x 980, 982 (6th Cir. 2007)).  A municipality cannot be held liable pursuant to 42 U.S.C. § 1983 on a theory of *respondeat superior*. *Monell*, 436 U.S. at 691-95; *Phillips*, 534 F.3d at 543 (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300

(6th Cir. 1999)).

If seeking to hold a municipality liable on a failure to train theory, the plaintiff must prove that: (1) the training or supervision was inadequate for the tasks the officer or employee was performing; (2) the inadequate training resulted from the defendant's deliberate indifference; (3) the inadequacy caused the injury. *Ellis v. Cleveland Municipal Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). "To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Miller v. Sanilac County*, 606 F.3d 240, 255 (6th Cir. 2010) (quotation marks and citations omitted). *See also Burgess*, 735 F.3d at 478-79 (finding that plaintiff failed to demonstrate the existence of prior instances of similar misconduct demonstrating that the defendant was on notice that its training and supervision in the particular area being challenged was deficient); *Savoie v. Martin*, 673 F.3d 488, 495 (6th Cir. 2012) ("'To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the [employer] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'") (quoting *Miller*, *supra*) (alteration in original); *Hearon v. City of Ferndale*, No. 11-14481, 2013 WL 823233, at *16 (E.D. Mich. March 6, 2013) (finding that plaintiff failed to establish deliberate indifference where there was no evidence of prior instances of unconstitutional conduct demonstrating that the City had "ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury"). Where failure to train and supervise claims are not couched as part of a pattern of unconstitutional practices, "a municipality may be held liable only where there is essentially a complete failure to train the police

51

force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982) (internal citations omitted).

Here, Plaintiff provides absolutely no evidence of a pattern of instances of excessive force of which Green Oak Township was made aware but ignored. Nor has Plaintiff established a complete failure to train the entire Green Oak Township police force on the subject of excessive force. Both Gravis and Moll testified that they receive excessive force training annually and Plaintiff offers no evidence to rebut these factual assertions. In fact, neither Gravis nor Moll has ever been sued before for excessive force or even received a substantiated citizen complaint alleging excessive force. Plaintiff's *Monell* claim is entirely without evidentiary support and the Court GRANTS Green Oak Township's motion for summary judgment.

## IV.   CONCLUSION

For the foregoing reasons, the Court: (1) GRANTS Green Oak Township's Motion for Summary Judgment and DISMISSES Green Oak Township from the case; (2) DENIES Gravis and Moll's Motion for Summary Judgment on Plaintiff's claims of excessive force under § 1983; (3) GRANTS Gravis and Moll's Motion for Summary Judgment on Plaintiff's Gross Negligence Claim; (4) DENIES Gravis and Moll's Motion for Summary Judgment on Plaintiff's Assault and Battery claim; and (5) GRANTS Defendants' Gravis and Moll's Motion for Summary Judgment on Plaintiff's False Arrest/False Imprisonment claim.[11]

---

[11] Defendant Livingston County was dismissed without prejudice by Stipulated Order of the parties on February 18, 2015. (ECF No. 23, Stipulated Order of Dismissal as to Defendant Livingston County Only.)

The case thus proceeds to trial against Gravis and Moll on Plaintiff's claims of excessive force and assault and battery.

IT IS SO ORDERED.


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  January 20, 2016

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 20, 2016.


s/Deborah Tofil
Case Manager